**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ROBERT SIMS,

                                                    Plaintiff,

         - v -                                                    Civ. No. 9:03-CV-1099
                                                                      (LEK/RFT)
GLENN S. GOORD, Commissioner of DOCS; DONALD
SELSKY, SHU Director; GEORGE DUNCAN,
Superintendent; R. DOLING, Employee of Central Office;
and NANCY KANNEGISER, Psychologist,

                                                    Defendants.

**APPEARANCES:**                                          **OF COUNSEL:**

ROBERT SIMS
Plaintiff, *Pro Se*
90-T-2814
Wende Correctional Facility
P.O. Box 1187
Alden, NY 14004

HON. ANDREW M. CUOMO                                NELSON SHEINGOLD, ESQ.
Attorney General for the State of New York          Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**REPORT-RECOMMENDATION and ORDER**

        *Pro se* Plaintiff Robert Sims brings a civil action pursuant to 42 U.S.C. § 1983, alleging

violations of his due process rights pursuant to the Fourteenth Amendment regarding three prison

disciplinary hearings and the creation of an unsafe environment in violation of the Eighth

Amendment.  Dkt. No. 1, Compl. at ¶¶ 1-28.  Defendants bring a Motion for Summary Judgment.

Dkt. No. 67.   Plaintiff opposes Defendants' Motion and cross-moves for Partial Summary

Judgment.[1]  Dkt. No. 70.  For the reasons to follow, it is recommended that the Defendants' Motion for Summary Judgment be **granted** and Plaintiff's Cross-Motion for Partial Summary Judgment be **denied**.

# I. FACTS[2]

On March 18, 2001, Corrections Officer ("C.O.") Della Gregory came upon Plaintiff while she was doing her rounds in his gallery and saw Plaintiff "standing naked in front of his cell masturbating."  Dkt. No. 67, Defs.' 7.1 Statement in Supp. at ¶ 1; Dkt. No. 67, Donald Selsky Decl., dated Aug. 7, 2006, Ex. B, Misbehavior Report ("Report"), dated Mar. 18, 2001, at p. 5.  Some time later, while C.O. Gregory did her next rounds, Plaintiff "again came to his cell door naked and began masturbating."  Defs.' 7.1 Statement in Supp. at ¶ 2; Selsky Decl., Ex. B, Report, dated Mar. 18, 2001, at p. 5.  As a result of these incidents, Plaintiff was issued a Report for violating Prison Rule 101.20, which states that an inmate shall not intentionally expose private parts.  Defs.' 7.1

---

[1] Plaintiff cross-moves for Summary Judgment on his Fourteenth Amendment due process claim solely in regards to his August 21, 2001 Hearing for throwing unknown liquids on a corrections officer and making threats.  *See* Dkt. No. 70, Pl.'s Brief in Supp. of Partial S.J.; Dkt. No. 70, Robert Sims Decl. in Supp., dated Dec. 7, 2006; *see infra* Parts I & II.B.  Plaintiff does not mention his other two Hearings nor his Eighth Amendment claim.  Pl.'s Brief in Supp.; Sims Decl. in Supp.

[2] As Defendants bring a Motion for Summary Judgment and Plaintiff cross-moves for Partial Summary Judgment, Defendants' 7.1 Statement in support of their Motion will be referred to as "Defs.' 7.1 Statement in Supp." and Plaintiff's opposition to Defendants' Motion will be referred to as "Pl.'s 7.1 Statement in Opp'n."  However, in support of his Cross-Motion, Plaintiff submits two 7.1 Statements, one is entitled "Statement of Material Facts" and the other is entitled "Statement of Undisputed Material Facts."  *See* Dkt. No. 70.  Therefore, Plaintiff's 7.1 Statement of Material Facts in support of his Motion will be referred as "Pl.'s 7.1 Material Statement in Supp.," the Statement of Undisputed Material Facts will be called "Pl.'s 7.1 Undisputed Statement in Supp.," and Defendants' 7.1 Statements in opposition to Plaintiff's Motion will be referred to as "Defs.' 7.1 Material Statement in Opp'n" and "Defs.' 7.1 Undisputed Statement in Opp'n."  Although Plaintiff attempts to comply with Northern District of New York Local Rule 7.1(a)(3) in his response to Defendants' Motion for Summary Judgment, he has failed to do so since he does not admit nor deny all of the movant's assertions and furthermore, where Plaintiff denies a statement made by Defendants, on certain occasions he fails to cite to the record to show that a factual issue exists.  *See* Dkt. No. 70, Pl.'s 7.1 Statement in Opp'n.  As such, any facts not specifically controverted by Plaintiff may be deemed admitted.  N.D.N.Y.L.R. 7.1(a)(3).  Nevertheless, this Court will utilize Plaintiff's Statement of Facts and accompanying Exhibits as well as Defendants' Statement of Material Facts with accompanying Exhibits to adduce the uncontested, material facts of the case.

Statement in Supp. at ¶ 3; Selsky Decl., Ex. B, Report, dated Mar. 18, 2001, at p. 5; *see also* N.Y.

Comp. Codes R. & Regs. tit. 7, § 270.2(B)(2)(iii).  Plaintiff was provided with written notice of the

charges and met with an assistant of his choosing on March 21, 2001.  Defs.' 7.1 Statement in Supp.

at ¶ 4; Dkt. No. 70, Pl.'s 7.1 Statement in Opp'n at ¶ 4; Selsky Decl., Ex. B, Assistant Form at p. 7.

Although Plaintiff asked his assistant for many items for the upcoming Hearing, including a

videotape, log book entries, activity logs, medical records, a picture of his penis, grievance

complaints, and Department of Correctional Services ("DOCS") directives, Plaintiff did not list any

witnesses to be interviewed, however, he stated he would select them at the Hearing.  Defs.' 7.1

Statement in Supp. at ¶¶ 5 & 6; Pl.'s 7.1 Statement in Opp'n at ¶¶ 5 & 6; Selsky Decl., Ex. B,

Assistant Form, dated Mar. 21, 2001, at p. 7; Dkt. No. 70, Robert Sims Decl. in Opp'n, dated Dec.

13, 2006, Ex. 34, Employee Assistant List, dated Mar. 20, 2001.

  Hearing Officer Doling commenced the Tier III Hearing on April 2, 2001, based upon the

March 18th Report.  Defs.' 7.1 Statement in Supp. at ¶ 7; Pl.'s 7.1 Statement in Opp'n at ¶ 7; Dkt.

No. 71, Pl.'s 7.1 Material Statement in Supp. at ¶ 1; Dkt. No. 74, Defs.' 7.1 Material Statement in

Opp'n at ¶ 1; Dkt. No. 67, Nelson R. Sheingold Decl., dated Aug. 18, 2006, Ex. A, Hr'g Tr., dated

Apr. 2, 2001.  After several arguments between Plaintiff and Doling over behavioral and procedural

issues, Doling finally agreed to take notice that Plaintiff was not masturbating.  Defs.' 7.1 Statement

in Supp. at ¶ 8; Pl.'s 7.1 Statement in Opp'n at ¶ 8; Sheingold Decl., Ex. A, Hr'g Tr. at pp. 2-11.

This obviated the need to examine Plaintiff's allegation that he suffered from some type of erectile

dysfunction and negated the need to view a picture of his penis.  Defs.' 7.1 Statement in Supp. at ¶

8; Pl.'s 7.1 Statement in Opp'n at ¶ 8; Sheingold Decl., Ex. A, Hr'g Tr. at pp. 9-14.  Plaintiff also

acknowledged in the Hearing that this was the first time C.O. Gregory had issued a Report to him.

Defs.' 7.1 Statement in Supp. at ¶ 9; Pl.'s 7.1 Statement in Opp'n at ¶ 9; Sheingold Decl., Ex. A, Hr'g Tr. at p. 12.  Plaintiff was then asked if he wished to call any witnesses, but Plaintiff declined. Defs.' 7.1 Statement in Supp. at ¶ 10; Pl.'s 7.1 Statement in Opp'n at ¶ 10; Sheingold Decl., Ex. A, Hr'g Tr. at p. 15.  Plaintiff stated that he waived his right to call witnesses until after a review of the videotape.  Defs.' 7.1 Statement in Supp. at ¶ 11; Pl.'s 7.1 Statement in Opp'n at ¶ 11; Sheingold Decl., Ex. A, Hr'g Tr. at p. 16.  Plaintiff was again asked if he had any witnesses and at that point a list of over twenty witnesses was produced, though Doling did not allow them to testify since Plaintiff's assistant had not asked any of them what they observed prior to the Hearing .  Defs.' 7.1 Statement in Supp. at ¶¶ 12-17; Sheingold Decl., Ex. A, Hr'g Tr. at pp. 16-17.  Plaintiff finally stated he wanted to call one witness, inmate Green, who was in the cell next to his.  Sheingold Decl., Ex. A, Hr'g Tr. at pp. 15-16.

Later, the Hearing was adjourned until April 4, 2001, at which time Plaintiff and Doling reviewed the videotape of the incident.  Defs.' 7.1 Statement in Supp. at ¶ 16; Pl.'s 7.1 Statement in Opp'n at ¶ 16; Sheingold Decl., Ex. A, Hr'g Tr. at pp. 25-28.  Apparently, a nurse had been around Plaintiff's gallery sometime during Gregory's first round, but Doling did not allow the nurse to be called as a witness because the videotape revealed the nurse left prior to the incident.  Defs.' 7.1 Statement in Supp. at ¶ 17; Sheingold Decl., Ex. A, Hr'g Tr. at p. 27.  While watching the videotape, Plaintiff and Doling argued about the lighting within the gallery at the time of the incident.  Defs.' 7.1 Statement in Supp. at ¶ 18; Sheingold Decl., Ex. A, Hr'g Tr. at pp. 27-28. Subsequently, Plaintiff asked if inmate Green could be called as his witness, however, Doling denied this request stating that the videotape showed that an inmate in a cell next to Plaintiff's could not have seen into Plaintiff's cell.  Defs.' 7.1 Statement in Supp. at ¶¶ 19 & 24; Pl.'s 7.1 Statement

in Opp'n at ¶ 24; Pl.'s 7.1 Material Statement in Supp. at ¶ 2; Defs.' 7.1 Material Statement in

Opp'n at ¶ 2; Sheingold Decl., Ex. A, Hr'g Tr. at p. 29; Dkt. No. 67, Pl.'s Dep., dated Nov. 1, 2004,

at p. 13, lines 9-13.[3]  During the Hearing, Doling had warned Plaintiff several times regarding his

behavior and shortly after the request to call Green as a witness was denied, Plaintiff was excluded

from the rest of the Hearing after further arguing with Doling.  *See* Sheingold Decl., Ex. A, Hr'g Tr.

at pp. 3-30.

Once Plaintiff was removed, C.O. Gregory testified that she had not been stationed on

Plaintiff's gallery prior to the incident and that she saw Plaintiff masturbating in her direction while

he attempted to speak to her.  Defs.' 7.1 Statement in Supp. at ¶¶ 20 & 21; Sheingold Decl., Ex. A,

Hr'g Tr. at p. 31.  C.O. Gregory further stated that she was not aware of anyone else who could be a

witness to the incident.  Defs.' 7.1 Statement in Supp. at ¶ 22; Sheingold Decl., Ex. A, Hr'g Tr. at p.

32.  After the testimony concluded, Doling rendered his decision and found Plaintiff guilty of

violating Rule 101.20.  Sheingold Decl., Ex. A, Hr'g Tr. at pp. 34-35.  The penalty imposed was one

hundred-eighty (180) days confinement in the Special Housing Unit ("SHU"), a corresponding loss

of packages, commissary, and phone privileges, and Plaintiff would be placed on a restricted diet for

fourteen (14) days.  *Id.*; Pl.'s 7.1 Material Statement in Supp. at ¶ 5; Defs.' 7.1 Material Statement

in Opp'n at ¶ 5.  Plaintiff appealed the disposition to Selsky, who affirmed the findings on May 30,

2001.  Defs.' 7.1 Statement in Supp. at ¶ 23; Pl.'s 7.1 Statement in Opp'n at ¶ 23; Pl.'s 7.1 Material

Statement in Supp. at ¶¶ 8 & 9; Defs.' 7.1 Material Statement in Opp'n at ¶¶ 8 & 9; Selsky Decl.,

Ex. B, Review of Hr'g, dated May. 30, 2001, at p. 1; Sims Decl. in Opp'n, Ex. 33, Hr'g Appeal,

---

[3] Plaintiff's deposition transcript does not seem to be attached as an Exhibit to any of the Declarations provided to this Court.  *See* Dkt. No. 67.

dated Apr. 11, 2001.

On August 7, 2001, Plaintiff's property was "frisked" by C.O. Lee and two papers were discovered; one contained the names of various correctional personnel, their social security numbers, and names of their relatives and the other, entitled "Names of Officers on List," contained a list of the corrections officers' names whose personal information appeared on the other sheet. Defs.' 7.1 Statement in Supp. at ¶ 25; Pl.'s 7.1 Statement in Opp'n at ¶ 25; Selsky Decl., Ex. C, Notes at pp. 9 & 10.  The same day, Lee issued a Report to Plaintiff charging him with a violation of Prison Rule 113.26, inmate in possession of personal staff information.  Defs.' 7.1 Statement in Supp. at ¶ 26; Pl.'s 7.1 Statement in Opp'n at ¶ 26; Selsky Decl., Ex. C, Report, dated Aug. 7, 2001, at p. 5; *see also* N.Y. COMP. CODES R. & REGS. tit. 7, § 270.2(B)(14)(xvi).  The possession of this type of information could endanger the safety and security of correctional staff and the functionality of the correctional system for numerous reasons.  Defs.' 7.1 Statement in Supp. at ¶¶ 30-33; Pl.'s 7.1 Statement in Opp'n at ¶¶ 30-33.  Plaintiff was served with the Report and met with his Tier Assistant on August 9 and 10, 2001, wherein Plaintiff requested a number of witnesses be interviewed and a number of items be presented to him, including DOCS directives, an activity log, and a memorandum.  Defs.' 7.1 Statement in Supp. at ¶ 27; Pl.'s 7.1 Statement in Opp'n at ¶ 27; Selsky Decl., Ex. C, Assistant Form, dated Aug. 10, 2001, at p. 14; Sims Decl. in Opp'n, Ex. 28, Employee Assistance List, dated Aug. 13, 2001.

A Tier III Hearing was conducted by Hearing Officer Nancy Kannegiser on August 21, 2001, in regards to the August 7th Report.  Defs.' 7.1 Statement in Supp. at ¶ 28; Pl.'s 7.1 Statement in Opp'n at ¶ 28; Pl.'s 7.1 Material Statement in Supp. at ¶ 23; Defs.' 7.1 Material Statement in Opp'n at ¶ 23; Sheingold Decl., Ex. B, Hr'g Tr., dated Aug. 21, 2001.  Plaintiff sought to call several

*-6-*

witnesses, including but not limited to Superintendent Duncan, Commissioner Goord, and a judge, however, Kannegiser found Plaintiff's list of witnesses to be irrelevant as to the matter stated in the Report. Defs.' 7.1 Statement in Supp. at ¶ 34; Pl.'s 7.1 Material Statement in Supp. at ¶ 24; Defs.' 7.1 Material Statement in Opp'n at ¶ 24; Sheingold Decl., Ex. B, Hr'g Tr. at pp. 9-12. Plaintiff was found guilty of the Rule violation and the penalty imposed was three hundred sixty-five (365) days in SHU and a disciplinary surcharge of $5.00. Defs.' 7.1 Statement in Supp. at ¶ 29; Pl.'s 7.1 Statement in Opp'n at ¶ 29; Pl.'s 7.1 Material Statement in Supp. at ¶ 27; Defs.' 7.1 Material Statement in Opp'n at ¶ 27; Sheingold Decl., Ex. B, Hr'g Tr. at p. 12. Plaintiff appealed the disposition and Selsky affirmed the determination on October 25, 2001. Defs.' 7.1 Statement in Supp. at ¶ 29; Pl.'s 7.1 Statement in Opp'n at ¶ 29; Pl.'s 7.1 Material Statement in Supp. at ¶¶ 29 & 30; Defs.' 7.1 Material Statement in Opp'n at ¶¶ 29 & 30; Selsky Decl., Ex. C, Review of Hr'g, dated Oct. 25, 2001, at p. 1; Sims Decl. in Opp'n, Ex. B, Appeal, dated Aug. 26, 2001.

On August 10, 2001, C.O. Lee issued Plaintiff a Report alleging that while walking down Plaintiff's gallery, Sims threw an unknown liquid on Lee's shirt and pants and also yelled threats and obscenities at Lee. Defs.' 7.1 Statement in Supp. at ¶¶ 35-37; Pl.'s 7.1 Statement in Opp'n at ¶ 37; Selsky Decl., Report, dated Aug. 10, 2001, at p. 11. The Report charged Plaintiff with violations of Prison Rules 100.11, assault on staff, 118.22, unhygienic act, and 102.10, spoken threats. Defs.' 7.1 Statement in Supp. at ¶ 37; Pl.'s 7.1 Statement in Opp'n at ¶ 37; Dkt. No. 70, Pl.'s 7.1 Undisputed Statement in Supp. at ¶ 1; Dkt. No. 74, Defs.' 7.1 Undisputed Statement in Opp'n at ¶ 1; Selsky Decl., Report, dated Aug. 10, 2001, at p. 11; *see also* N.Y. COMP. CODES R. & REGS. tit. 7, §§ 270.2(B)(1)(ii), (3)(I), & (19)(iv). Plaintiff received a copy of the charges and met with his Tier Assistant on August 15, 2001. Defs.' 7.1 Statement in Supp. at ¶¶ 38 & 42; Pl.'s 7.1

Statement in Opp'n at ¶¶ 38 & 42; Selsky Decl., Assistant Form, dated Aug. 15, 2001, at p. 12.  The

form filled out by the assistant indicates that no witnesses were requested, though other items were

requested.  Defs.' 7.1 Statement in Supp. at ¶¶ 39 & 40; Pl.'s 7.1 Statement in Opp'n at ¶ 39; Selsky

Decl., Assistant Form, dated Aug. 15, 2001, at p. 12.

On August 21, 2001, a Tier III Hearing was conducted by Kannegiser regarding the August

10th Report.  Defs.' 7.1 Statement in Supp. at ¶ 41; Pl.'s 7.1 Statement in Opp'n at ¶ 41; Pl.'s 7.1

Material Statement in Supp. at ¶ 12; Defs.' 7.1 Material Statement in Opp'n at ¶ 12; Sheingold

Decl., Ex. C, Hr'g Tr., dated Aug. 21, 2001.  Prior to C.O. Lee's testimony regarding the alleged

incident, Plaintiff stated he did not want to be present if Lee testified claiming that he feared for his

life.  Defs.' 7.1 Statement in Supp. at ¶ 43; Pl.'s 7.1 Statement in Opp'n at ¶ 43; Sheingold Decl.,

Ex. C, Hr'g Tr. at pp. 5-6.  Lee did testify in Plaintiff's presence and after the witness concluded, the

Hearing was adjourned until a videotape of the incident could be reviewed.  Defs.' 7.1 Statement in

Supp. at ¶ 44; Pl.'s 7.1 Statement in Opp'n at ¶ 44; Sheingold Decl., Ex. C, Hr'g Tr. at pp. 7-9.  The

Hearing continued on August 24, 2001, after Plaintiff and Kannegiser had viewed the videotape, at

which point Plaintiff, for the first time, asked for several witnesses to testify, including every inmate

on the company, regardless of whether they were present at the time of the alleged incident.  Defs.'

7.1 Statement in Supp. at ¶ 45; Pl.'s 7.1 Statement in Opp'n at ¶ 45; Pl.'s 7.1 Undisputed Statement

in Supp. at ¶ 2; Defs.' 7.1 Undisputed Statement in Opp'n at ¶ 2; Sheingold Decl., Ex. C, Hr'g Tr. at

pp. 10-13.  The Hearing Officer denied Plaintiff's request since the Tier Assistant had not had the

opportunity to interview any of the proposed witnesses to determine if their testimonies would be

relevant.  Defs.' 7.1 Statement in Supp. at ¶ 46; Pl.'s 7.1 Material Statement in Supp. at ¶ 13; Defs.'

7.1 Material Statement in Opp'n at ¶ 13; Pl.'s 7.1 Undisputed Statement in Supp. at ¶¶ 3 & 4; Defs.'

7.1 Undisputed Statement in Opp'n at ¶¶ 3 & 4; Sheingold Decl., Ex. C, Hr'g Tr. at p. 13; Selsky

Decl., Ex. D, Denial of Witness Testimony, dated Aug. 24, 2001, at p. 32.  Kannegiser rendered her

decision and found Plaintiff guilty of the Rule violations.  Defs.' 7.1 Statement in Supp. at ¶ 47;

Pl.'s 7.1 Statement in Opp'n at ¶ 47; Pl.'s 7.1 Undisputed Statement in Supp. at ¶ 5; Defs.' 7.1

Undisputed Statement in Opp'n at ¶ 5; Sheingold Decl., Ex. C, Hr'g Tr. at p. 13.  The penalty

imposed was three hundred sixty-five (365) days in SHU and a recommendation for a special diet

for thirty (30) days.[4]  Defs.' 7.1 Statement in Supp. at ¶ 47; Pl.'s 7.1 Statement in Opp'n at ¶ 47;

Pl.'s 7.1 Material Statement in Supp. at ¶ 17; Defs.' 7.1 Material Statement in Opp'n at ¶ 17; Pl.'s

7.1 Undisputed Statement in Supp. at ¶ 8; Defs.' 7.1 Undisputed Statement in Opp'n at ¶ 8;

Sheingold Decl., Ex. C, Hr'g Tr. at p. 13.

Plaintiff appealed this determination on August 26, 2001, to Commissioner Goord.  Pl.'s 7.1

Material Statement in Supp. at ¶ 19; Defs.' 7.1 Material Statement in Opp'n at ¶ 19; Pl.'s 7.1

Undisputed Statement in Supp. at ¶ 6; Defs.' 7.1 Undisputed Statement in Opp'n at ¶ 6; Selsky

Decl., Ex. D, Appeal, dated Aug. 26, 2001, at pp. 3-7.  On October 18, 2001, after a review of the

Hearing, Selsky reversed the determination stating that "[t]he [h]earing [o]fficer inappropriately

denied witnesses who may have provided relevant testimony."  Pl.'s 7.1 Material Statement in Supp.

at ¶ 20; Defs.' 7.1 Material Statement in Opp'n at ¶ 20; Pl.'s 7.1 Undisputed Statement in Supp. at ¶

6; Defs.' 7.1 Undisputed Statement in Opp'n at ¶ 6; Selsky Decl., Ex. D, Review of Hr'g, dated Oct.

18, 2001, at p. 2, & Selsky Mem. to Duncan, dated Oct. 18, 2001, at p. 1.  Plaintiff did serve a

---

[4] In a memorandum by Lucien Leclaire, Deputy Commissioner, on April 24, 2000, he stated that "[f]or misconduct occurring on or after May 15, 2000, the maximum length of a restricted diet penalty should not exceed 21 days as a result of any individual Superintendent's Hearing.  Exceptions are permitted for extremely disruptive inmates who continue to display conduct which warrants the imposition of restricted diets."  Sims Decl. in Opp'n, Ex. 27, Leclaire Mem., dated Apr. 24, 2000.

portion of the restricted diet penalty imposed prior to the reversal.  Pl.'s 7.1 Undisputed Statement in Supp. at ¶ 7; Defs.' 7.1 Undisputed Statement in Opp'n at ¶ 7.

Great Meadow Correctional Facility ("Great Meadow") houses a minimum of 1,400-1,500 inmates, who are routinely transferred amongst DOCS facilities, and Superintendent Duncan is required to maintain the facility and deal with issues regarding inmates, civilian staff, and security of the facility.  Defs.' 7.1 Statement in Supp. at ¶¶ 48-50; Pl.'s 7.1 Statement in Opp'n at ¶¶ 48-50. Superintendent Duncan receives thousands of letters each year from inmates complaining about a variety of issues, and as such, he is not able to personally investigate many of the complaints.  Defs.' 7.1 Statement in Supp. at ¶¶ 51 & 52; Pl.'s 7.1 Statement in Opp'n at ¶¶ 51 & 52.  The complaints are delegated to the appropriate department to respond and, if a letter deals with conditions in the facility or SHU, they are forwarded to Deputy Superintendent for Administration Richard Potter or his staff for investigation and to provide a response.  Defs.' 7.1 Statement in Supp. at ¶¶ 53-55; Pl.'s 7.1 Statement in Opp'n at ¶¶ 53 & 54.

Plaintiff sent Superintendent Duncan a letter on May 22, 2001,[5] regarding the condition of the facility, which was forwarded for investigation to Potter and his staff.  Defs.' 7.1 Statement in Supp. at ¶¶ 56, 124, & 136-38; Pl.'s 7.1 Statement in Opp'n at ¶¶ 56 & 124; Dkt. No. 67, Richard Potter Decl., dated Aug. 7, 2006, Ex. A, Pl.'s Lt., dated May 22, 2001, & Duncan Mem., dated May 24, 2001.  Plaintiff complained of rodent, insect, bird, and pest issues in his housing unit.  Defs.' 7.1 Statement in Supp. at ¶¶ 60 & 61; Potter Decl., Ex. A, Pl.'s Lt., dated May 22, 2001.  However, no such complaints were made by the facility's employees' union.  Defs.' 7.1 Statement in Supp. at ¶

_____

[5] Although Defendants state Plaintiff's letter was written on May 24, 2001, the letter is dated May 22, 2001, and it was received by the Superintendent's office on May 24, 2001.  *See* Dkt. No. 67, Richard Potter Decl., dated Aug. 7, 2006, Ex. A, Pl.'s Lt., dated May 22, 2001.

125; Pl.'s 7.1 Statement in Opp'n at ¶ 125.  Potter forwarded Plaintiff's letter to James Lanfear, Plant Superintendent, who responded to Plaintiff stating that the pest control vendor would visit his area regarding the rodents and insects.  Defs.' 7.1 Statement in Supp. at ¶ 139; Pl.'s 7.1 Statement in Opp'n at ¶ 139; Potter Decl., Ex. A, Lanfear Mem., dated June 6, 2001.

During the time Plaintiff was incarcerated at Great Meadow, the facility contracted with professional pest control experts to visit the facility every Tuesday and take any appropriate action. Defs.' 7.1 Statement in Supp. at ¶¶ 127 & 141.  The professionals were to inspect and treat all areas necessary, including the cells of inmates who complained of any problems.  *Id.* at ¶ 128.  There is also a monthly inspection done at the facility by environmental service teams and every year a team from DOCS Central Office inspects the entire facility.  *Id.* at ¶¶ 129 & 130.  Apparently, over the last nine years there have been no reports of pest control problems at Great Meadow.  *Id.* at ¶ 131.

In addition, the facility must be accredited every three years by a national organization in which inspections of the facility are conducted.  *Id.* at ¶¶ 132-34; Pl.'s 7.1 Statement in Opp'n at ¶¶ 132-34.  Great Meadow was accredited in both 2000 and 2003 and there were no notations made about any pest control problems.  Defs.' 7.1 Statement in Supp. at ¶ 135; Pl.'s 7.1 Statement in Opp'n at ¶ 135.

If there were issues with birds, the pest control company would set traps to catch them and if bird droppings were reported by an inmate, they were cleaned.  Defs.' 7.1 Statement in Supp. at ¶¶ 125 & 142-43.  In regard to the birds, Potter's staff was in contact with the New York State Department of Environmental Conservation in an effort to find out how to resolve issues that arose regarding the birds.  *Id.* at ¶ 144.  Then in June 2001, Lanfear submitted a construction request to have nuisance screens fabricated and installed on the cell block windows, which was approved by

the facility and sent to the Office of Facilities Planning for DOCS approval.  *Id.* at ¶ 145; Pl.'s 7.1

Statement in Opp'n at ¶ 145.  On August 2, 2001, Great Meadow was advised that the request for

construction was canceled because Corcraft, a division of DOCS, was going to temporarily handle

the problem.  Defs.' 7.1 Statement in Supp. at ¶ 146; Pl.'s 7.1 Statement in Opp'n at ¶ 146.  Corcraft

repaired screens in the cell blocks and installed netting on windows without screens to keep birds

from entering the facility and in addition, bird traps were still used for the problem.  Defs.' 7.1

Statement in Supp. at ¶ 147.  Subsequent to Plaintiff's transfer, permanent screens were installed.

*Id.* at ¶ 148; Pl.'s 7.1 Statement in Opp'n at ¶ 148.

Plaintiff further complained about the bed in his cell claiming he did not have a safe bed

because of the metal bed bars.  Compl. at ¶¶ 21 & 22.  The beds at Great Meadow accommodate

inmates who are 6'3" and under.  Defs.' 7.1 Statement in Supp. at ¶ 149.  Because Plaintiff's official

medical records lists him at 6'2", he was given the ordinary bed.  *Id.* at ¶ 150.  Plaintiff did not

request a longer bed.  *Id.* at ¶ 151.

If a prisoner's complaint deals with security issues, including deprivation orders, pursuant to

DOCS policy it is forwarded to Deputy Superintendent for Security Patrick Van Guilder or his staff.

*Id.* at ¶¶ 54, 57, 58, & 77; Pl.'s 7.1 Statement in Opp'n at ¶¶ 54, 57, & 77; Sims Decl. in Opp'n, Ex.

D, DOCS Directive 4933, at § 305.2; *see also* N.Y. COMP. CODES R. & REGS. tit. 7, § 305.2.  DOCS

Directive 4933, § 305.2, deals with the use of restraints and deprivation orders for inmates housed in

SHU and states that a SHU inmate can be deprived of certain items, privileges, or services if it is

determined that a safety or security issue exists.  Defs.' 7.1 Statement in Supp. at ¶¶ 62 & 63; Pl.'s

7.1 Statement in Opp'n at ¶¶ 62 & 63; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at §

305.2; *see also* N.Y. COMP. CODES R. & REGS. tit. 7, § 305.2 (a).  Under §§ 305.2(b) and (c), a

deprivation order must be authorized by the officer of the day, the deputy superintendent for

security, or a higher ranking officer and the order must be reviewed daily by the deputy

superintendent for security or, in his absence, the officer of the day or higher ranking official.  Defs.'

7.1 Statement in Supp. at ¶ 64; Pl.'s 7.1 Statement in Opp'n at ¶ 64; Sims Decl. in Opp'n, Ex. D,

DOCS Directive 4933, at §§ 305.2(b) & (c); *see also* N.Y. COMP. CODES R. & REGS. tit. 7, §§

305.2(b) & (c).  Once an order is issued that is in effect for seven days, it needs to be renewed on the

seventh day and every seventh day thereafter.  Defs.' 7.1 Statement in Supp. at ¶ 64; Pl.'s 7.1

Statement in Opp'n at ¶ 64; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at § 305.2(c); *see*

*also* N.Y. COMP. CODES R. & REGS. tit. 7, § 305.2(c).  Pursuant to § 305.2(d), an order or notice of

renewal must briefly state the reasons for the deprivation and further state, "You may write to the

deputy superintendent for security or his/her designee to make a statement on the need for

continuing the deprivation order."  Defs.' 7.1 Statement in Supp. at ¶ 65; Pl.'s 7.1 Statement in

Opp'n at ¶ 65; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at § 305.2(d); *see also* N.Y.

COMP. CODES R. & REGS. tit. 7, § 305.2(d).  An inmate who is issued a deprivation order may be

made to remain in restraints even during the exercise period.  Defs.' 7.1 Statement in Supp. at ¶ 73;

Pl.'s 7.1 Statement in Opp'n at ¶ 73.  Issues that relate to deprivation orders are not "grievable"

pursuant to the DOCS grievance system but instead are directed to the deputy superintendent for

security.  Defs.' 7.1 Statement in Supp. at ¶ 78.

DOCS Directive 4933, § 305.4, deals with the issuance of restraint orders to inmates in

SHU.  Defs.' 7.1 Statement in Supp. at ¶ 66; Pl.'s 7.1 Statement in Opp'n at ¶ 66; Sims Decl. in

Opp'n, Ex. D, DOCS Directive 4933, at § 305.4; *see also* N.Y. COMP. CODES R. & REGS. tit. 7, §

305.4(a).  If a SHU inmate has a history of assaultive behavior or presents a threat to others,

himself, or state property, a restraint order may be issued.  Defs.' 7.1 Statement in Supp. at ¶ 67; Pl.'s 7.1 Statement in Opp'n at ¶ 67; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at § 305.4; *see also* N.Y. Comp. Codes R. & Regs. tit. 7, § 305.4(a).  If a restraint order is issued, the inmate will be in some degree of restraints, which may include full hand, chain, and leg restraints or a modified version of those restraints.  Defs.' 7.1 Statement in Supp. at ¶¶ 68 & 69; Pl.'s 7.1 Statement in Opp'n at ¶¶ 68 & 69; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at § 305.4; *see also* N.Y. Comp. Codes R. & Regs. tit. 7, § 305.4.  The deputy superintendent for security, or in his absence, the officer on duty or higher ranking authority may issue such an order, which is valid for no more than seven days and may be renewed.  Defs.' 7.1 Statement in Supp. at ¶¶ 70 & 71; Pl.'s 7.1 Statement in Opp'n at ¶¶ 70 & 71; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at § 305.4; *see also* N.Y. Comp. Codes R. & Regs. tit. 7, § 305.4(b).

Under § 305.6, a cell shield, which is a transparent cell front covering, may be ordered for "good cause" including, but not limited to, disruptive behavior by the inmate.  Defs.' 7.1 Statement in Supp. at ¶ 74; Pl.'s 7.1 Statement in Opp'n at ¶ 74; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at § 305.6; *see also* N.Y. Comp. Codes R. & Regs. tit. 7, §§ 305.6(a) & (b).  A cell shield order may be authorized by the deputy superintendent for security, or in his absence, a higher ranking official, and the order may last no more than seven days and may be renewed.  Defs.' 7.1 Statement in Supp. at ¶ 75; Pl.'s 7.1 Statement in Opp'n at ¶ 75; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at § 305.6(c); *see also* N.Y. Comp. Codes R. & Regs. tit. 7, § 305.6(c).  Inmates are informed that they may write to the deputy superintendent for security to make a statement regarding the continued use of the cell shield.  Defs.' 7.1 Statement in Supp. at ¶ 76; Pl.'s 7.1 Statement in Opp'n at ¶ 76; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at § 305.6(d); *see*

*also* N.Y. COMP. CODES R. & REGS. tit. 7, § 305.6(d).

Pursuant to DOCS Directive 4933, § 304.2, an inmate may be placed on a restricted diet as a disciplinary sanction when an inmate has been continually disruptive, is not eligible for good-time credit, and has lost all other privileges.  Defs.' 7.1 Statement in Supp. at ¶ 116; Pl.'s 7.1 Statement in Opp'n at ¶ 116; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at § 304.2; *see also* N.Y. COMP. CODES R. & REGS. tit. 7, § 304.2(b).  If a hearing officer recommends a restricted diet as a sanction, the Superintendent sends a memorandum to the Health Services Director of the facility in order to follow the dictates of DOCS Directive 4933.  Defs.' 7.1 Statement in Supp. at ¶ 117; Pl.'s 7.1 Statement in Opp'n at ¶ 117; Sims Decl. in Opp'n, Ex. D, DOCS Directive 4933, at § 304.2; *see also* N.Y. COMP. CODES R. & REGS. tit. 7, § 304.2(c).

**A.  Deprivation Orders**

Prior to 2001, Plaintiff had an extensive history of assaultive behavior including assault on staff, arson, possession of a weapon, sex offenses, threats, violent conduct, creating a disturbance, lewd conduct, unhygienic acts, damaging property, tampering with state property, harassment, and disobeying direct orders.  Defs.' 7.1 Statement in Supp. at ¶ 72; Pl.'s 7.1 Statement in Opp'n at ¶ 72; Selsky Decl., Ex. A, Inmate Disciplinary History.  Because of this behavior, Plaintiff was issued several deprivation orders while he was housed in SHU in 2001.  Defs.' 7.1 Statement in Supp. at ¶ 79; Pl.'s 7.1 Statement in Opp'n at ¶ 79; Sims Decl. in Opp'n, Ex. 30, Inmate Disciplinary History.  Superintendent Duncan did not issue nor renew any of Plaintiff's deprivation orders.  Defs.' 7.1 Statement in Supp. at ¶ 59.

On April 13, 2001, Plaintiff was issued a deprivation order depriving him of the privilege of a cell light for destroying his cell light that day.  Defs.' 7.1 Statement in Supp. at ¶ 102; Pl.'s 7.1

Statement in Opp'n at ¶ 102; Dkt. No. 67, Patrick Van Guilder Decl., dated Aug. 16, 2006, Ex. D,

Deprivation Order, dated Apr. 13, 2001.  This order was reviewed daily until April 21, 2001.  Defs.'

7.1 Statement in Supp. at ¶ 103; Van Guilder Decl., Ex. D, Deprivation Orders, dated Apr. 14, 15,

16, 17, 18, 19, 20, and 21, 2001.  Beginning on April 21, 2002, the deprivation was renewed twice

by a weekly review until May 3, 2001, at which time the deprivation was removed.  Defs.' 7.1

Statement in Supp. at ¶ 103; Van Guilder Decl., Ex. D, Deprivation Orders, dated Apr. 21 and 28,

2001.

On May 1, 2001, Plaintiff sent a letter to Duncan complaining of the deprivation and

restraint orders issued to him.  Van Guilder Decl., Ex. C, Pl.'s Lt., dated May 1, 2001.  This letter

was transferred to Van Guilder, who in turn asked SHU Sergeant R. C. Finnegan to conduct an

investigation.  *Id.*, Ex. C, Van Guilder Lt., dated May 7, 2001, & Finnegan Lt., dated May 4, 2001.

In a letter to Van Guilder, Finnegan stated he interviewed Plaintiff and informed him that the orders

were put in place to preserve the safety of the unit and were not intended as punishment.  *Id.*  The

letter also noted the reason for the restraint order and that his cell light was repaired on May 2, 2001,

when the cell light deprivation was removed.  *Id.*  Finnegan further noted that Plaintiff stated he was

satisfied with the explanation and results.  *Id.*  Van Guilder responded to Plaintiff's letter expressing

that Finnegan had conducted the interview and the issues were resolved.  *Id.*, Ex. C, Van Guilder

Lt., dated May 7, 2001.

Then, on August 24, 2001, after returning from a Hearing, Plaintiff allegedly used his waist

chain to smash his cell lights and threatened staff.  Defs.' 7.1 Statement in Supp. at ¶ 104; Pl.'s 7.1

Statement in Opp'n at ¶ 104; Van Guilder Decl., Ex. D, Deprivation Order, dated Aug. 24, 2001.

Based on that information, a deprivation order was issued that day depriving Plaintiff the privilege

*-16-*

of a cell light and out of cell activity.  Defs.' 7.1 Statement in Supp. at ¶ 104; Pl.'s 7.1 Statement in

Opp'n at ¶ 104; Van Guilder Decl., Ex. D, Deprivation Order, dated Aug. 24, 2001.  The order was

reviewed and renewed until September 8, 2001, at which time the deprivation was removed.  Defs.'

7.1 Statement in Supp. at ¶ 104; Pl.'s 7.1 Statement in Opp'n at ¶ 104; Van Guilder Decl., Ex. D,

Deprivation Orders, dated Aug. 24, 25, 26, 27, 28, 29 and 30, 2001, & Sept. 1, 2001.  A deprivation

order was also issued on January 16, 2002, when Plaintiff threatened staff with violence and

Plaintiff was deprived of the privilege of leaving his cell.  Van Guilder Decl., Ex. D, Deprivation

Order, dated Jan. 16, 2002.  The order was removed the next day when Plaintiff was placed on hand

and chain restraints.  *Id.*, Ex. D, Deprivation Order, dated Aug. 18, 2002.

### B.  Restraint Orders

On April 13, 2001, Plaintiff was ordered to be placed under full restraints whenever he was

to be outside of his cell since he refused orders to walk to the shower and then assaulted staff.

Defs.' 7.1 Statement in Supp. at ¶ 80; Van Guilder Decl., Ex. B, Restraint Order, dated Apr. 13,

2001.  This order was renewed each week from April 16, 2001 until May 21, 2001.  Defs.' 7.1

Statement in Supp. at ¶ 81; Pl.'s 7.1 Statement in Opp'n at ¶ 81; Van Guilder Decl., Ex. B, Restraint

Orders, dated Apr. 16, 23, and 30, 2001 & May 7 and 14, 2001.  On May 21, 2001, the full restraint

order was modified to only hand and chain restraints when Plaintiff was out of his cell and the

modified order was renewed from May 28, 2001 until June 4, 2001.  Defs.' 7.1 Statement in Supp.

at ¶¶ 82 & 83; Van Guilder Decl., Ex. B, Restraint Orders, dated May 21 and 28, 2001, & June 4,

2001.  On June 4, 2001, Plaintiff was interviewed by Finnegan who recommended that the restraint

order be removed, which was done that same day by Acting Deputy Superintendent for Security S.

Rowe.  Defs.' 7.1 Statement in Supp. at ¶ 84; Pl.'s 7.1 Statement in Opp'n at ¶ 84; Van Guilder

Decl., Ex. B, Mem. from Finnegan, dated June 4, 2001.

On August 10, 2001, because Plaintiff was reported to have thrown an unknown liquid at SHU security personnel, a new restraint order was issued authorizing full hand, chain, and leg restraints whenever Plaintiff was to be out of his cell.  Defs.' 7.1 Statement in Supp. at ¶ 85; Pl.'s 7.1 Statement in Opp'n at ¶ 85; Van Guilder Decl., Ex. B, Restraint Order, dated Aug. 10, 2001. This order was renewed from August 13, 2001 until September 10, 2001.  Defs.' 7.1 Statement in Supp. at ¶ 86; Pl.'s 7.1 Statement in Opp'n at ¶ 86; Van Guilder Decl., Ex. B, Restraint Orders, dated Aug. 13, 20, and 27, 2001, & Sept. 3, 2001.  On September 10, 2001, the order was renewed again with full restraints, but a notation was made that Plaintiff continued to make additional threats to staff even after the August 10th incident.  Defs.' 7.1 Statement in Supp. at ¶ 87; Van Guilder Decl., Ex. B, Restraint Order, dated Sept. 10, 2001.  This order was renewed from September 17, 2001 until November 11, 2001.  Defs.' 7.1 Statement in Supp. at ¶ 88; Pl.'s 7.1 Statement in Opp'n at ¶ 88; Van Guilder Decl., Ex. B, Restraint Orders, dated Sept. 17 and 24, 2001, Oct. 1, 8, 14, 21, and 28, 2001, & Nov. 4, 2001.  On November 11, 2001, another notation was made that Plaintiff continued to display aggressive and threatening behavior, so the order was renewed once again until December 2, 2001.  Defs.' 7.1 Statement in Supp. at ¶¶ 89 & 90; Pl.'s 7.1 Statement in Opp'n at ¶ 90; Van Guilder Decl., Ex. B, Restraint Orders, dated Nov. 11, 18, and 25, 2001.

On December 2, 2001, the order was modified to include only hand and chain restraints, which was renewed until January 6, 2002.  Defs.' 7.1 Statement in Supp. at ¶¶ 91 & 92; Pl.'s 7.1 Statement in Opp'n at ¶¶ 91 & 92; Van Guilder Decl., Ex. B, Restraint Orders, dated Dec. 2, 9, 16, 23, and 30, 2001.  On January 6, 2002, Plaintiff was interviewed by SHU Sergeant C. Blaise, who recommended removal of the restraint order, which was done the same day by Captain Rowe.

Defs.' 7.1 Statement in Supp. at ¶ 93; Pl.'s 7.1 Statement in Opp'n at ¶ 93; Van Guilder Decl., Ex.

B, Mem. from Blaise, dated Jan. 6, 2002.  However, on January 16, 2002, Plaintiff was again placed

on a restraint order of hand and chain restraints for threatening staff on that day.  Defs.' 7.1

Statement in Supp. at ¶ 94; Pl.'s 7.1 Statement in Opp'n at ¶ 94; Van Guilder Decl., Ex. B, Restraint

Order, dated Jan. 16, 2002.  This order was renewed until February 17, 2002, when it was noted that

Plaintiff's attitude remained the same, which caused the order to be renewed again until Plaintiff's

transfer from Great Meadow on March 24, 2002.  Defs.' 7.1 Statement in Supp. at ¶¶ 95-97; Pl.'s

7.1 Statement in Opp'n at ¶¶ 95 & 96; Van Guilder Decl., Ex. B, Restraint Orders, dated Jan. 20 and

27, 2001, February 3, 10, 17 and 24, 2002, & Mar. 3, 10, and 17, 2002.

Plaintiff wrote a letter to Superintendent Duncan regarding the restraint orders, which was

forwarded to the deputy superintendent for security to conduct an investigation and provide a

response.  Defs.' 7.1 Statement in Supp. at ¶ 99; Pl.'s 7.1 Statement in Opp'n at ¶ 99; Van Guilder

Decl., Ex. C, Pl.'s Lt., dated May 1, 2001.[6]  Neither Finnegan, who conducted the investigation, nor

Captain Van Guilder, who responded to Plaintiff's letter, are named defendants in this action.

Defs.' 7.1 Statement in Supp. at ¶¶ 100 & 101; Van Guilder Decl., Ex. C, Finnegan Mem., dated

May 4, 2001, & Van Guilder Lt., dated May 7, 2001.

### C.  Cell Shield Orders

On August 10, 2001, Plaintiff was issued a cell shield order by Van Guilder when he

allegedly threw an unknown liquid onto staff from his cell.  Defs.' 7.1 Statement in Supp. at ¶ 106;

Pl.'s 7.1 Statement in Opp'n at ¶ 106; Van Guilder Decl., Ex. E, Cell Shield Order, dated Aug. 10,

---

[6] Defendants state "letters" were written but Defendants only provided the Court with one letter written by
Plaintiff and Plaintiff does not additionally point to any other letters he may have written.  *See* Defs.' 7.1 Statement in
Supp. at ¶ 99; Pl.'s 7.1 Statement in Opp'n at ¶ 99; Van Guilder Decl., Ex. C, Pl.'s Lt., dated May 1, 2001.

2001.  This order was renewed weekly until September 10, 2001.  Defs.' 7.1 Statement in Supp. at ¶ 107; Pl.'s 7.1 Statement in Opp'n at ¶ 107; Van Guilder Decl., Ex. E, Cell Shield Orders, dated Aug. 13, 20 and 27, 2001, & Sept. 3, 2001.  On September 10, 2001, Captain Rowe renewed the order again noting that Plaintiff continued to make threats towards the staff, and this order was renewed several more times until November 13, 2001, when the cell shield order was removed. Defs.' 7.1 Statement in Supp. at ¶¶ 108-11; Pl.'s 7.1 Statement in Opp'n at ¶¶ 109 & 111; Van Guilder Decl., Ex. E, Cell Shield Orders, dated Sept. 10, 17 and 24, 2001, Oct. 1, 8, 21 and 28, 2001, & Nov. 4, 2001, & Birrell Mem., dated Nov. 13, 2001.

On January 16, 2002, Plaintiff was issued another cell shield order for banging on his cell wall and creating a disturbance.  Defs.' 7.1 Statement in Supp. at ¶ 112; Van Guilder Decl., Ex. E, Cell Shield Order, dated Jan. 16, 2002.  This order was renewed until February 17, 2002, when a new order was issued based on Plaintiff's continued behavioral problems.  Defs.' 7.1 Statement in Supp. at ¶¶ 112 & 113; Van Guilder Decl., Ex. E, Cell Shield Orders, dated Jan. 20 and 27, 2002, & Feb. 3, 10 and 17, 2002.  This new order was renewed until March 24, 2002.  Defs.' 7.1 Statement in Supp. at ¶ 114; Pl.'s 7.1 Statement in Opp'n at ¶ 114; Van Guilder Decl., Ex. E, Cell Shield Orders, dated Feb. 24, 2002, and Mar. 3, 10 and 17, 2002.

### D.  Restricted Diet

On April 4, 2001, as a result of a Hearing on a lewd exposure violation presided over by Doling, one penalty imposed upon Plaintiff was that he would be placed on a restricted diet for fourteen days.  Sheingold Decl., Ex. A, Hr'g Tr. at pp. 34-35.  After the Hearing was completed, Superintendent Duncan was notified of the restricted diet and he further notified the Commissioner of the same.  Van Guilder Decl., Ex. F, Disciplinary Office Mem. to Duncan, dated Apr. 4, 2001, &

Duncan Mem. to Goord, dated Apr. 4, 2001.  On April 5, 2001, Duncan sent a letter to the Health

Services Director asking that Plaintiff be examined to determine if he could "be placed on the diet

without jeopardizing his health."  Defs.' 7.1 Statement in Supp. at ¶ 120; Pl.'s 7.1 Statement in

Opp'n at ¶ 120; Van Guilder Decl., Ex. F, Duncan Mem. to Health Services Director, dated Apr. 5,

2001.  The doctor approved the diet.  Defs.' 7.1 Statement in Supp. at ¶ 120; Pl.'s 7.1 Statement in

Opp'n at ¶ 120; Van Guilder Decl., Ex. F, Duncan Mem. to Health Services Director, dated Apr. 5,

2001.  On April 9 and 19, 2001, and May 1 and 8, 2001, Duncan sent the Health Services Director

letters directing that a diet which is wholesome and nutritious be established for Plaintiff and that

Plaintiff be monitored by medical staff within twenty-four hours of the commencement of the

restricted diet and daily thereafter.  Defs.' 7.1 Statement in Supp. at ¶¶ 118 & 119; Pl.'s 7.1

Statement in Opp'n at ¶¶ 118 & 119; Van Guilder Decl., Ex. F, Mem. by Duncan, dated Apr. 9 and

19, 2001, and May 1 and 8, 2001.  Plaintiff was intermittently placed on the restricted diet between

April and May and the diet concluded on May 23, 2001.  Van Guilder Decl., Ex. F, Health Services

Director Mem. to Duncan, dated May 23, 2001.

On May 7, 2001, Plaintiff wrote a letter to Duncan complaining of the restricted diet.  Defs.'

7.1 Statement in Supp. at ¶ 122; Pl.'s 7.1 Statement in Opp'n at ¶ 122; Van Guilder Decl., Ex. F,

Pl.'s Mem. to Duncan, dated May 7, 2001.  SHU Sergeant Finnegan conducted an investigation and

sent Van Guilder his findings in a memorandum.  Defs.' 7.1 Statement in Supp. at ¶ 123; Van

Guilder Decl., Ex. F, Finnegan Mem., dated May 11, 2001.  Captain Kelly responded to Sims on

May 15, 2001, stating that due to Plaintiff's transfer between SHU and the Mental Health Unit

("MHU"), it may have been possible that Plaintiff received a restricted diet for fifteen instead of

fourteen days, but this mistake was not meant to harass or annoy him.  Defs.' 7.1 Statement in Supp.

at ¶ 123; Van Guilder Decl., Ex. F, Kelly Lt., dated May 15, 2001.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party.  FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in

deciding a summary judgment motion" and the credibility of such statements is better left to a trier

of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.

1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities

and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier

Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary

judgment motion stage of the litigation is carefully limited to discerning whether there are any

genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this

point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential

Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## B. Due Process Claims

Plaintiff claims that his Fourteenth Amendment due process rights were violated in three

different disciplinary hearings. Compl. at ¶¶ 1-20. Specifically, Plaintiff claims that: 1) at his April

2001 Hearing, Doling denied his right to call witnesses, present evidence, and comment on the

charges and evidence, did not provide him with a copy of the disposition, and Doling, Duncan,

Selsky, and Goord allowed the imposition of the penalty of the restricted diet even though Plaintiff

believes it is unlawful; 2) at his August 21, 2001 Hearing regarding the two papers with the names

and information of correctional personnel, Kannegiser denied him witnesses, the right to introduce

evidence and comment on the charges, and did not provide him with a copy of the disposition; and

3) at his August 21, 2001 Hearing for throwing an unknown liquid and making verbal threats,

Kannegiser again denied him witnesses, the right to introduce evidence and comment on the

charges, did not provide him with a copy of the disposition, and the penalty of the restricted diet was

not stopped by Duncan or Goord.  Compl. at ¶¶ 1, 3, 6, 8, 10, 13, 15, & 17; Dkt. No. 70, Pl.'s Mem.

of Law in Opp'n at pp. 5-12; Dkt. No. 70, Pl.'s Mem. of Law in Supp. at pp. 1-5.  Defendants assert

Plaintiff received all due process required to him and thus, Plaintiff's rights under the Fourteenth

Amendment were not violated.  Dkt. No. 67, Defs.' Mem. of Law at pp. 1-16.  Plaintiff asserts, at

least in terms of the August 21, 2001 Hearing for throwing an unknown liquid and making verbal

threats, that there is no question a constitutional violation occurred and summary judgment should

be granted to him.  Dkt. No. 70.

   The Fourteenth Amendment to the Constitution states that "no State shall . . . deprive any

person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The

Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of

confinement that "exceed[] the sentence in . . . an unexpected manner[.]"  *Sandin v. Conner*, 515

U.S. 472, 484 (1995).  "To present a due process claim, a plaintiff must establish (1) that he

possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of

insufficient process."  *Giano v. Selsky*, 37 F. Supp. 2d 162, 167 (N.D.N.Y.), *vacated and remanded*

*on other grounds by* 238 F.3d 223 (2d Cir. 2001) (citing *Bedoya v. Coughlin*, 91 F.3d 349, 351-52

(2d Cir. 1996)).  In *Sandin*, the Supreme Court ruled that the Constitution did not require that

restrictive confinement within a prison be preceded by procedural due process protections unless the

confinement subjected the prisoner to "atypical and significant hardship . . . in relation to the

ordinary incidents of prisoner life."  515 U.S. at 484; *see also Giano v. Selsky*, 238 F.3d at 225

(citing *Sandin v. Conner*, 515 U.S. at 484); *Welch v. Bartlett*, 196 F.3d 389, 392 (2d Cir. 1999).

Thus, a prisoner asserting that he was denied due process in connection with segregated

confinement or a loss of privileges must make a threshold showing that the deprivation of which he

complains imposed such an "atypical and significant hardship." *See Sandin v. Conner*, 515 U.S. at 484.

Factors relevant to an analysis of what constitutes an atypical and significant hardship include: "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon*, 1998 WL 167297, at *5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999) (citations omitted). However, "[w]here the plaintiff was confined for an intermediate duration-- between 101 and 305 days–'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards*, 364 F.3d at 64-65 (quoting *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000)); *see also Hanrahan v. Doling*, 331 F.3d 93, 97-98 (2d Cir. 2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest."); *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000) (noting that segregative sentences of 125-288 days are "relatively long" and therefore necessitate "specific articulation of . . .

factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards*, 364 F.3d at 65 (citations omitted); *see also Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998); *Brooks v. DiFasi*, 112 F.3d 46, 49 (2d Cir. 1997).[7] In determining whether a liberty interest was infringed, the Court must look to "[t]he actual duration of confinement" and not the pronounced sentence, which should be examined in analyzing the second prong of the qualified immunity analysis. *Palmer v. Richards*, 364 F.3d at 66 n. 4. If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards*, 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin*. *Id.*

Here, Plaintiff must make the threshold showing of an atypical and significant hardship since a claim of denial of due process was asserted. Sims received: 1) 180 days in SHU, 180 days loss of packages, commissary, and phone privileges, and a 14 day restricted diet for the April 2, 2001 Hearing; 2) 365 days in SHU for the August 21, 2001 Hearing on the possession of letters containing the names of correctional personnel; and 3) 365 days in SHU and a recommended restricted diet for 30 days for the August 21, 2001 Hearing regarding the throwing of the unknown liquid and verbal threats made. Sheingold Decl., Exs. A, Hr'g Tr., dated Apr. 2, 2001, at pp. 34-35; B, Hr'g Tr., dated Aug. 21, 2001, at p. 12 (possession of papers); & C, Hr'g Tr., dated Aug. 21,

---

[7] Department of Correctional Services policies provide the conditions of confinement prisoners are subject to when confined in SHU. *See* N.Y. COMP. CODES R. & REGS. tit. 7, §§ 304.1-.14 & 305.1-.6.

2001, at p. 13 (unknown liquid & threats).[8]  As for the first Hearing, the amount of time in SHU

falls within the intermediate duration and thus the Court must develop a record of the conditions of

confinement.[9]  In terms of the second Hearing, the confinement is longer than the intermediate

duration and thus, Plaintiff would receive the protection of procedural due process.  *See Sims v.*

*Artuz*, 230 F.3d at 23 (holding one-year SHU confinement is atypical and significant); *Colon v.*

*Howard*, 215 F.3d at 231 (finding 305 days of SHU is atypical).[10]

As for the third Hearing, the disposition was reversed on appeal and the record was

expunged so there is no evidence to show Plaintiff served any of the 365 days.  *See generally* Pl.'s

Mem. of Law in Opp'n; Sims Decl. in Opp'n; Dkt. No. 70, Pl.'s Mem. of Law in Supp.; Dkt. No.

70, Pl.'s Decl. in Supp., dated Dec. 7, 2006; Selsky Decl. at ¶ 13, Ex. A, Inmate Disciplinary

History.  The Second Circuit has held that an administrative reversal constitutes part of the due

process protection an inmate receives, "and it cure[s] any procedural defect that may have

occurred."  *Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir.), *cert. denied*, 510 U.S. 837 (1993)

(noting as a policy matter that "this possibility of cure through the administrative appeals process

will encourage prison administrators to correct errors as an alternative to forcing inmates to seek

relief in state or federal courts" (citation omitted)).  Furthermore, if there is an administrative

---

[8] The April 2nd Hearing will be referred to as the "first Hearing," the August 21st Hearing regarding the possession of the papers will be the "second Hearing," and the August 21, 2001 Hearing for the unknown liquid and threats will be referenced as the "third Hearing."

[9] Although the Hearing Transcript states Plaintiff was to receive time in SHU, the disciplinary history shows 180 days in keeplock.  *Compare* Sheingold Decl., Ex. A, Hr'g Tr., dated Apr. 2, 2001, at pp. 34-35 *with* Selsky Decl., Ex. A, Inmate Disciplinary History.  The Court is unclear as to where Plaintiff actually served his confinement.

[10] Once again, the Hearing Transcript for the second Hearing states Plaintiff was to receive time in SHU, though the disciplinary history shows 365 days in keeplock. *Compare* Sheingold Decl., Ex. B, Hr'g Tr., dated Aug. 21, 2001, at p. 12 *with* Selsky Decl., Ex. A, Inmate Disciplinary History.  The Court cannot be sure as to where Plaintiff actually served his confinement.

reversal and the inmate is never penalized, then the inmate "suffer[s] no interference with a liberty interest and has no valid claim for relief." *Id.* (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 465 (1989)).  Therefore, since there was an administrative reversal on the third Hearing and Plaintiff did not serve any of the 365 day sentence, Plaintiff has failed to establish a liberty interest in the third Hearing regarding the length of confinement.  Selsky Decl. at ¶ 13; *see Bozzuto v. Sarra*, 2001 WL 266028, at *2 (W.D.N.Y. Mar. 12, 2001) (finding that the inmate suffered no interference with his liberty interest and citing *Young* for the proposition that even if the inmate suffered a denial of due process in his disciplinary hearing, the administrative reversal cured any procedural defects); *Nevares v. Morrissey*, 1999 WL 760231, at *6 (S.D.N.Y. Sept. 27, 1999) (holding that because there was no dispute that the inmate was ever subjected to any disciplinary action as a result of his hearing, the plaintiff had no viable due process claim).

However, as to the restricted diet imposed in this third Hearing, Plaintiff claims he was placed on the diet for twenty-one (21) days prior to the reversal of the disposition of the Hearing.[11] Dkt. No. 70, Robert Sims Decl. in Supp., dated Dec. 7, 2006, at ¶ 11.  In order to claim an atypical and significant hardship in regards to a restricted diet, the inmate "must allege that the restricted diet is nutritionally inadequate or otherwise poses a threat to his physical well-being." *Amaral v. Greis*, 2001 WL 1705112, at *2 (W.D.N.Y. Nov. 5, 2001) (citing *Dumpson v. Rourke*, 1997 WL 610652 at *2 (N.D.N.Y. Sep. 26, 1997)) (other citations omitted).  Here, Plaintiff does not claim that the diet was nutritionally inadequate.  *See* Pl.'s Mem. of Law in Opp'n; Pl.'s Mem. in Supp.; Sims Decl. in Opp'n; Sims Decl. in Supp.  Although Plaintiff generally alleges that he suffered from stomach

---

[11] Defendant Duncan modified the thirty day restricted diet to twenty-one days.  Sims Decl. in Opp'n, Ex. 26, Disposition Rendered, dated Aug. 24, 2001; Selsky Decl., Ex. D, Restricted Diet Mem. at p. 30.

aches, headaches, loss of weight and sleep, "psychotic and pain," and serious injuries to his heart, the record conflicts with Plaintiff's claims. *See* Sims Decl. in Opp'n at ¶ 30, Ex. 36, Sick Call Form, dated Aug. 24, 2001. On August 24, 2001, when Plaintiff submitted a "Sick Call" slip stating he had these symptoms, Plaintiff had not even begun the restricted diet as such diet began on August 29, 2001. Selsky Decl., Ex. D, Interdepartmental Communication, dated Aug. 28, 2001, at p. 31. Furthermore, on several occasions while on the diet, Plaintiff made no complaints about his medical condition whatsoever. Sims Decl. in Opp'n at ¶ 30, Ex. C, Ambulatory Health Record ("AHR") entries, dated Aug. 30, 2001, Sept. 2, 4, 6, and 8, 2001, & Oct. 3, 9, and 10, 2001. Because of Plaintiff's inability to establish that the diet posed a threat to his physical well-being as on many occasions he stated he had absolutely no complaints while on the diet, even if Plaintiff did complete twenty-one days on the restricted diet, the Court finds that it is insufficient to state a cognizable due process claim since Plaintiff has failed to show an atypical and significant hardship. *See Dawes v. Kelly*, 2004 WL 2284885, at *3 (W.D.N.Y. Oct. 7, 2004) (finding no liberty interest in being sentenced to a twenty-eight day restricted diet).

In regards to the first Hearing where the Court must examine the conditions of confinement, the Second Circuit has stated that:

> [u]nder the "normal conditions of SHU confinement in New York," the prisoner is: placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited.

*Palmer v. Richards*, 364 F.3d at 66 n.3 (citations omitted); *see also supra* note 7.

Plaintiff claims that he suffered atypical and significant conditions of confinement that normally do

not occur when a penalty is assessed for such Rule violations.  Pl.'s Mem. of Law at p. 3; Sims

Decl. in Opp'n at ¶¶ 15, 41, 43, & 48 n.5.  Plaintiff states he was denied normal meals, the right to

exercise in the SHU yard without restraints, cell lights, a clean cell and housing unit, a safe bed, and

he was placed in a cell with a cell shield on the bars.  Pl.'s Mem. of Law at p. 3; Sims Decl. in

Opp'n at ¶¶ 15, 41, 43, & 48 n. 5; *see also supra* Part I (including subparts A, B, C, & D); *Welch v.*

*Bartlett*, 196 F.3d at 393 (stating that allegations of "inadequate amounts of toilet paper, soap and

cleaning materials, a filthy mattress, and infrequent changes of clothes" may constitute an atypical

and significant hardship); *Palmer v. Richards*, 364 F.3d at 65 (finding that the deprivation of

personal belongings, use of mechanical restraints, and discontinuation of communication may give

rise to a liberty interest).  Since Defendants do not contest that a liberty interest was created by any

of these conditions mentioned as to the first Hearing, the Court may decide the *Sandin* issue as a

matter of law.  Defs.' Mem. of Law at p. 8.

In accordance with due process, "an inmate is entitled to advance written notice of the

charges against him; a hearing affording him a reasonable opportunity to call witnesses and present

documentary evidence; a fair and impartial hearing officer; and a written statement of the

disposition, including the evidence relied upon and the reasons for the disciplinary actions taken."

*Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell*, 418 U.S. 563-67))

(further citations omitted).

Notwithstanding, "[t]hese procedures, of course, must in certain circumstances give way to

institutional safety or correctional goals."  *Young v. Hoffman*, 970 F.2d at 1156 (citation omitted);

*Richardson v. Van Dusen*, 833 F. Supp. 146, 152 (N.D.N.Y. 1993).  Thus, even though "inmates

may present testimonial and documentary evidence in disciplinary proceedings, their due process

rights are 'subject to restrictions imposed by the nature of the regime to which they have been lawfully committed.'" *Branch v. Goord*, 2006 WL 2807168, at *4 (S.D.N.Y. Sept. 28, 2006) (quoting *Wolff v. McDonnell*, 418 U.S. at 556); *see also Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (stating that "[t]he right to call witnesses is circumscribed . . . by the penological need to provide swift discipline in individual cases and by the very real dangers in prison life which may result from violence or intimidation" (cited in *Branch v. Goord*, 2006 WL 2807168, at *4).  It has also been held that "[w]itnesses or documents may . . . be denied because of lack of relevance or necessity." *Branch v. Goord*, 2006 WL 2807168, at *4 (citing *Wolff v. McDonnell*, 418 U.S. at 566; *Scott v. Kelly*, 962 F.2d 145, 147 (2d Cir. 1992); & *Kingsley v. Bureau of Prisons*, 937 F.2d at 30). Accordingly, prison administrators are afforded discretion in this area "to balance competing interests and place reasonable limits on hearings." *Id.* (citing *Wolff v. McDonnell*, 418 U.S. at 566 & *Scott v. Kelly*, 962 F.2d at 147 n.2 for the proposition that a court "must defer to the judgment of prison officials in balancing prisoners' rights against penological interests").

## 1.  April 2, 2001 Hearing

Plaintiff claims that he was denied the right to call witnesses, namely inmate Green, present documentary evidence including grievance complaints, medical records, the DOCS employees manual, and certain DOCS directives, and comment on the charges and evidence.  Pl.'s Mem. of Law in Opp'n at pp. 5-8.  He also asserts that the penalty of the restricted diet was unlawful and he did not receive a copy of the disposition of the Hearing.  *Id.*

In terms of the refusal to allow certain witnesses to testify, including inmate Green, prior to viewing a videotape of the incident, Doling asked if Plaintiff wished to call any witnesses to which Plaintiff responded by saying "no, not at this time."  Sheingold Decl., Ex. A, Hr'g Tr. at p. 15.  Sims

then tried to point out a DOCS directive that said he could call witnesses at any time during the

Hearing, but Doling stated he decides when it is time for witnesses to be called and not Plaintiff. *Id.*

at pp. 15-16.  Plaintiff said he would waive his right to witnesses until the videotape was reviewed

but Plaintiff became upset when Doling stated no witnesses would be called. *Id.* at p. 16.

Subsequently, Doling attempted to get the names of over twenty witnesses Plaintiff wanted to testify

to which he responded "I call them all!"  *Id.*  Doling denied that request as it was not specific

enough and since the assistant never had the chance to interview them to see if they had any relevant

information as to the incident.  *Id.* at pp. 16-17.  Finally, Plaintiff stated he would call one witness,

inmate Green, who was in the cell next to his.  *Id.* at pp. 17-18.  Plaintiff later requested that a nurse

and the watch commander be called as witnesses since he claimed they were present at the time of

the incident; Doling reserved decision on those two witnesses.  *Id.* at pp. 19-20 & 24.  Plaintiff also

wanted to call the superintendent, who was not present at the time of the incident, but to which

Doling reserved his decision as it may have related to a retaliation claim made by Plaintiff, as well

as the commissioner, a witness Doling eventually denied for "being silly."  *Id.* at pp. 20-21.  The

request for Selsky and Senior Counselor Robert was also denied.  *Id.* at p. 22.  After viewing the

videotape, Doling stated the nurse's testimony would be irrelevant to the issue of lewdness.  *Id.* at p.

27.  Plaintiff wanted to prove she could only see down the gallery with a flashlight but Doling stated

there was plenty of light and the nurse's use or non-use of a flashlight did not matter.  *Id.* at pp. 27-

28.  He further noted the nurse was not present during the incident.  *Id.*  Doling also excluded

Green's testimony after determining that this inmate could not see into Plaintiff's cell in order to

verify if the incident took place.[12]  *Id.* at p. 29.  After Plaintiff was removed because of his behavior, Doling attempted to clarify the retaliation claim made by Sims.  *Id.* at pp. 30-32.  C.O. Gregory claimed there was no reason for retaliation and that she did not know Plaintiff prior to this incident. *Id.*  She also confirmed there was enough light in the gallery and that she saw Plaintiff masturbating. *Id.* at p. 31.

As for the many documents sought, Plaintiff requested his grievances because he was endeavoring to prove retaliation by C.O. Gregory who issued the Misbehavior Report against him. *Id.* at p. 12.  Doling stated he would reserve decision until he dealt with the retaliation issue.  *Id.* Plaintiff's request for his medical records was also deemed unnecessary.  *Id.* at pp. 9-11.  Since the Report stated he was masturbating, Plaintiff was attempting to prove that he could not masturbate because he was medically incapable of having an erection.  *Id.* at pp. 10-11.  However, Doling stated the medical records were not needed as he agreed to assume Plaintiff could not masturbate, though he advised Plaintiff that the charge was lewd exposure, not masturbation.  *Id.* at p. 11.  Plaintiff, in addition, asked for the employee manual so that he could prove that DOCS personnel were not allowed to write false misbehavior reports.  *Id.* at p. 18.  Doling agreed that it would be a violation of the employee rules to do such and asked what other reason existed to see the manual.  *Id.* Plaintiff kept stating he wanted to use it to prove his Report was false, however, Doling said the manual was not needed because its mere existence could not prove whether Plaintiff's Report was false.  *Id.* at pp. 18-19.  As for the DOCS directives, after Plaintiff went through lengthy and somewhat convoluted explanations at times as to why the documents were needed, stating he was

---

[12] It is interesting to note that in Plaintiff's deposition, he claimed that an inmate in the cell next to him, possibly Green, was going to testify that the other inmate committed the act of exposing himself, not Plaintiff.  Dkt. No. 67, Pl.'s Dep., dated Nov. 1, 2004, at p. 14, lines 1-21.  However, no mention of this was made during the Hearing.

trying to prove retaliation and that women officers were not allowed on his block in case inmates were on the toilet, Doling denied the requests stating the directives were irrelevant or had no bearing to the charge at hand of lewd exposure. *Id.* at pp. 4-7 & 13. Additionally, during the entirety of the Hearing, Plaintiff had numerous opportunities to comment on the charges and evidence. *Id.* at pp. 2-30.

It is clear from the record that Doling's exclusion of the witnesses and documents were warranted. The witnesses Plaintiff sought to introduce were not necessary and had no relevance to the Hearing since none were present at the incident and could not shed any light as to whether Plaintiff committed the act set forth in the Report. The same reasoning pertains to the documents as they were not relevant nor necessary to either prove or disprove that Plaintiff committed the lewd act. Though Plaintiff may feel otherwise, he was afforded a reasonable opportunity to call witnesses and present documentary evidence. Prison administrators may deny witnesses and documents if they are irrelevant and the Court must defer to the judgment of Doling since his exercise of discretion was not abusive. *See Branch v. Goord*, 2006 WL 2807168, at *5.

As for the restricted diet claim, again the Court notes that Plaintiff "must allege that the restricted diet is nutritionally inadequate or otherwise poses a threat to his physical well-being." *Amaral v. Greis*, 2001 WL 1705112, at *2 (W.D.N.Y. Nov. 5, 2001). Plaintiff does not claim the diet was nutritionally inadequate but does assert that the fourteen-day diet caused Plaintiff to become psychotic and have mental health issues. Pl.'s Mem. of Law in Opp'n at p. 8. Although there are indications that Plaintiff was admitted to OBS Mental Health on several occasions during the time he was on a restricted diet, Plaintiff has not provided evidence that there is a correlation between the diet and the admission. Sims Decl. in Opp'n, Ex. 37, Finnegan Mem., dated May 11,

2001.  Pointedly, in his appeal of the Hearing, he states he "was not capable of responding to the charge in a meaningful way **at the Hearing** due to mental illness." *Id.*, Ex. 33, Hr'g Appeal, dated Apr. 11, 2001, at p. 7, Point 8 (emphasis added).  This is a clear indication that Plaintiff had this mental malady before he was placed on the restricted diet.  Furthermore, there is no evidence provided that there was a threat to Plaintiff's well-being as there are no Ambulatory Health Record entries for that time period nor are there any sick call requests from Plaintiff that he was suffering as a result of the diet.  *See generally* Sims Decl. in Opp'n, Exs. 1-37 & A-S.

Plaintiff also asseverates that he did not receive a copy of the April 2, 2001 Hearing disposition from Doling.  Sims Decl. in Opp'n at ¶ 10.  He appealed this issue to Goord, but the disposition of the Hearing was affirmed.  *Id.*, Ex. 33, Hr'g Appeal at p. 8, Point 10; Selsky Decl., Ex. B, Review of Hr'g, dated May. 30, 2001, at p. 1.  Plaintiff is afforded the right to receive "a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton*, 380 F.3d at 69.  The disposition form did not contain Plaintiff's signature that he actually received a copy of the disposition since the signature on the portion of the form that states he received a copy of the disposition is signed with an "excluded from Hearing" instead of an actual signature.  Selsky Decl., Ex. B, Superintendent Hr'g Disposition Rendered, dated Apr. 4, 2001, at p. 4.  However, at the end of the Hearing, Doling states that he was giving Officer Catalfamo a copy of the disposition and the appeal form to hand over to Plaintiff.  Sheingold Decl., Ex. A, Hr'g Tr. at p. 35.  On April 4, 2001, Officer Catalfamo provided Plaintiff with the hearing disposition rendered form, hearing disposition rendered, appeal form to Commissioner, and denial of witness testimony form.  Selsky Decl., Ex. B, Interdepartmental Communication, dated Apr. 4, 2001.  Furthermore, a witness was present when these forms were

presented to Plaintiff.  *Id.*  Plaintiff has provided no evidence to contradict that Officer Catalfamo provided him with the disposition of the Hearing.

## 2.  August 21, 2001 Hearing (possession of papers)

Plaintiff asserts that at his August 21, 2001 Hearing for the finding of two papers with the names of correctional personnel, their social security numbers, and names of their relatives, he was denied a number of witnesses, the right to introduce evidence, including DOCS directive 4933 and a videotape, and comment on the charges.  Pl.'s Mem. of Law in Opp'n at pp. 10-11. He further claims that did not receive a copy of the disposition.  *Id.*

At the beginning of the Hearing, Kannegiser asked Plaintiff if he still intended to request witnesses and then she read into the record the list of witnesses she previously received, which included Inspector General's Office Inspector Miller,[13] District Attorney Michael Okean, Court of Claims Clerk David Finnegan, County Court Judge Michael Bruen, Superintendent Duncan, and Commissioner Glenn Goord.  Sheingold Decl., Ex. B, Hr'g Tr., dated Aug. 21, 2001, at p. 3.  After expressing that he believed the two papers were taken out of his cell for retaliation purposes, he described why he needed each witness to testify.  *Id.* at pp. 6-9.  Plaintiff stated he wanted Goord because he sent Goord a complaint concerning Lee, the author of the Misbehavior Report, and Sergeant Finnegan's retaliation against him.  *Id.* at pp. 9-11.  Subsequently, Kannegiser stated she would call Lee as a witness but that she was denying the request for the other witnesses on the list because they were all public officials and none of them had any direct knowledge which could help

---

[13] Although the transcript initially states Inspector Knoll, as the Hearing proceeds, Plaintiff and the Hearing Officer discuss Inspector Miller, not Knoll.  Sheingold Decl., Ex. B, Hr'g Tr. at pp. 3-11.  Furthermore, on Plaintiff's assistant list, he names Inspector Miller as a person he wished to have interviewed, not Inspector Knoll.  Selsky Decl., Ex. C, Assistant Form, dated Aug. 10, 2001, at p. 14.

her arrive at a disposition in the matter. *Id.* at pp. 11-12.  Plaintiff now additionally claims that at

the Hearing he was not able to call eleven corrections officers from the Auburn Correctional

Facility.  Pl.'s Mem. of Law in Opp'n at p. 10.  There is no mention of any of these officers in the

Hearing nor can this Court venture a guess as to how Auburn corrections officers could shed light

on a Misbehavior Report written while Plaintiff was housed at Great Meadow.  *See* Sheingold Decl.,

Ex. B, Hr'g Tr.  None of these individuals exist on Plaintiff's list for his Tier Assistant of persons to

be interviewed as potential witnesses.  Selsky Decl., Ex. C, Assistant Form, dated Aug. 10, 2001, at

p. 14.

　　　　Plaintiff also claims that he was denied DOCS directive 4933 and a videotape.  The only

mention by Plaintiff during the Hearing of the DOCS directive was when C.O. Lee was testifying.

Sheingold Decl., Ex. B, Hr'g Tr. at pp. 15-16.  Lee was discussing the standard practice to conduct a

frisk when Plaintiff mentioned that directive 4933 outlines how a search of property can be

conducted.  *Id.*  However, Kannegiser noted that Lee had already answered the question regarding

frisk procedures.  *Id.* at p. 16.  As for the videotape, Plaintiff had mentioned it to his Tier Assistant

and reminded Kannegiser that he had requested the videotape because he wanted the videotape to

show that Lee conducted the frisk as a form of retaliation against him.  *Id.* at p. 16.  Yet, he did not

make an objection when the videotape was not produced.  *Id.*

　　　　The record reflects that the exclusion of the witnesses named in the Hearing was warranted.

The witnesses Plaintiff wished to call were not necessary and had no relevance to the Hearing since

none were present at the incident and could not aide the Hearing Officer to arrive at a decision as to

whether Plaintiff had committed the violation of possessing employee personal information.  DOCS

directive 4933 was also not relevant nor necessary since there was testimony as to how frisks were

conducted, which was the reason Plaintiff wanted the document.  As for the videotape, Plaintiff

made no objection on the record and Kannegiser relied on Lee's testimony and the Report to render

her decision.  Based on the record presented, the Court defers to the judgment of Kannegiser since

the witnesses were not relevant and the directive and videotape were not necessary.  *See Scott v.*

*Kelly*, 962 F.2d at 147 n.2.  Moreover, her exercise of discretion was not abusive.  *See Branch v.*

*Goord*, 2006 WL 2807168, at *5.

     In terms of Plaintiff's claim that he did not receive a written disposition of the Hearing,

Kannegiser provided all the reasons for her decision on the record and asked Plaintiff if he would

sign the disposition.  Sheingold Decl., Ex. B, Hr'g Tr. at pp. 13-14.  He said he could not because he

was in mechanical restraints, as so noted on the inmate's signature line on the disposition form.  *Id.*;

Selsky Decl., Ex. C, Superintendent Hr'g Disposition Rendered, dated Aug. 24, 2001, at p. 4.  He

then stated to Kannegiser that he did not understand what was transpiring so she reiterated that he

refused to sign the disposition form and she further explained to him the manner in which he could

appeal her decision.  Sheingold Decl., Ex. B, Hr'g Tr. at pp. 13-14.  She also clearly stated that she

was giving him a copy of the disposition, denial of witness form, and appeal form.  *Id.* at p. 14.

There is no evidence to show Plaintiff did not receive a copy of the disposition.

     For the reasons stated above, it is recommended that Defendants' Motion for Summary

Judgment be **granted** as to Plaintiff's Due Process claims.  Accordingly, it is recommended that

Plaintiff's Cross-Motion for Partial Summary Judgment on his Due Process claims regarding the

third Hearing be **denied**.

### C.  Eighth Amendment Claim

     Plaintiff claims that from January 24, 2001 until March 22, 2002, Defendants Duncan,

Goord, and Selsky deprived him of his cell lights, a safe bed, a clean cell and housing unit due to bird and mice droppings, exercises, and he was unlawfully placed in restraints and ordered to have a cell shield.  Compl. at ¶¶ 21 & 22.  Defendants claim that Plaintiff cannot establish an Eighth Amendment claim and that none of the named Defendants are personally involved in regards to these claims.  Defs.' Mem. of Law at pp. 17-25.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  However, in examining the conditions of an inmate's confinement, "[t]he Eighth Amendment does not mandate comfortable prisons, but . . . it does not tolerate inhumane ones either[.]" *Torres v. Selsky*, 2005 WL 948816, at *10 (N.D.N.Y. Apr. 25, 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  Thus,

> [a] claim alleging that prison conditions are in violation of the Eighth Amendment must satisfy both an objective and subjective requirement: the conditions complained of must be "sufficiently serious" from an objective standpoint, and the plaintiff must demonstrate that prison officials subjectively acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 298 & 297, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991). The required inquiry with regard to deliberate indifference is whether "the official knows of and disregards an excessive risk to inmate [health or] safety; the official must both be aware of facts from which the inference could be drawn [that a substantial risk of serious harm exists,] and [he] must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994).

*Leach v. Dufrain*, 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (citation omitted).

In regards to the objective element, in order to state a constitutional violation, "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Colon v. Sawyer*, 2006 WL 721763, at *7 (N.D.N.Y. Mar. 20, 2006) (quoting *Farmer v. Brennan,* 511 U.S. at 834) (internal quotation marks omitted).  "[T]he objective element is satisfied only when the

*-39-*

conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise -- for example, a low cell temperature at night combined with a failure to issue blankets." *Chavis v. Kienert*, 2005 WL 2452150, at *20 (N.D.N.Y. Sept. 30, 2005) (citation and internal quotation omitted).

Here, Plaintiff claims that Duncan, Goord, and Selsky denied him his right to exercise, a safe bed, and a clean cell and housing unit due to bird and mice droppings.  However, Plaintiff does not extrapolate upon how any of these particular individuals were responsible for any of the claims regarding his conditions of confinement.  *See* Compl. at ¶¶ 21 & 22; Pl.'s Mem. of Law in Opp'n at pp. 12-14.  Instead, as noted previously, if there were concerns or problems with conditions in the facility or SHU, the responsibility to investigate and provide a response would be Deputy Superintendent for Administration Richard Potter.  Dkt. No. 67, George Duncan Decl., dated Aug. 8, 2006, at ¶ 7; Potter Decl. at ¶¶ 2 & 3.  Potter is not a named defendant in this action.

In regards to Plaintiff's claims that he was denied his right to exercise and a safe bed, Plaintiff has provided absolutely no evidence that Duncan, Goord, or Selsky was ever notified of these problems.  *See* Sims Decl. in Opp'n, Exs. 1-37 & A-S.[14]  Furthermore, Potter states that the ordinary beds accommodate inmates who are 6'3" and under and since Plaintiff's official medical records list him at 6'2", he was given the ordinary bed.  Potter Decl. at ¶¶ 28 & 29.  Moreover, Plaintiff made no requests for a longer bed even though he claimed the metal bars were hurting him. *Id.* at ¶ 29; Compl. at ¶¶ 21 & 22.

Plaintiff did, however, send a letter to Duncan regarding the bird/vermin/mice problem,

---

[14] Plaintiff cites to a number of his Exhibits to establish his Eighth Amendment claim.  *See* Pl.'s Mem. of Law in Opp'n at p. 12, § D.  However, after thoroughly examining those Exhibits, the Court could not find anything of relevance except for the letter regarding the bird and pest problem.

which was immediately forwarded to Potter.  Potter Decl. at ¶ 15, Ex. A, Pl.'s Lt., dated May 22, 2001.  Duncan played no part in any investigation or response.  *Id.*  Potter then forwarded Plaintiff's letter to James Lanfear, Plant Superintendent, who in turn responded to Plaintiff stating that the pest control vendor would visit his area regarding the rodents and insects.  Potter Decl. at ¶ 16, Ex. A, Lanfear Mem., dated June 6, 2001.  As extensively described previously, Great Meadow contracted with professional pest control experts to visit the facility every Tuesday and take any appropriate action.  Potter Decl. at ¶ 7; *see supra* Part I.  The pest company inspected and treated areas every week, including the cells of inmates who complained of any problems.  Potter Decl. at ¶ 8; *see supra* Part I.  Additionally, Great Meadow was accredited, by inspections conducted in both 2000 and 2003, and there was no mention that the facility had any pest control problems.  Potter Decl. at ¶ 13; *see supra* Part I.

As to Plaintiff's complaint about the birds, Potter states that the facility did have some issues with small birds entering through open windows and doors.  Potter Decl. at ¶¶ 17 & 18; *see supra* Part I.  However, in response, the pest control company came to the facility weekly and set traps to catch the birds.  Potter Decl. at ¶ 19; *see supra* Part I.  Moreover, employees were subject to the same situation as inmates and no employees' union complained and if an inmate reported that there were bird droppings, they were cleaned up.  Potter Decl. at ¶¶ 5 & 21; *see supra* Part I.  In addition, in June 2001, Lanfear, the Plaint Supervisor, attempted to solve the problem by submitting a construction request to have nuisance screens fabricated and installed on the cell block windows, which was approved by the facility and sent to the Office of Facilities Planning for DOCS approval.  Potter Decl. at ¶ 23; *see supra* Part I.

In this case, it is clear that as to the claims for denial of his right to exercise, a safe bed, and

*-41-*

a clean cell and housing unit due to bird and mice droppings, Plaintiff has failed to allege that

Duncan, Goord, and Selsky were personally involved in any alleged constitutional violation since it

was Potter who had the responsibility in these areas.  *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.

1994) (stating that "personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983"); *see also Kinch v. Artuz*, 1997 WL 576038, at

\*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright

v. Smith*, 21 F.3d at 501) (holding that prison officials may not be found liable for a constitutional

violation merely because of the acts of those under his control).[15]  Notwithstanding, the Court is

hard-pressed to say that these claims are sufficiently serious to warrant Eighth Amendment

protection.  *See McNatt v. Unit Manager Parker*, 2000 WL 307000, at \*4 (D. Conn. Jan. 18, 2000)

(finding no Eighth Amendment violation when inmates endured stained, smelly mattresses; unclean

cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no

toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function

properly; and smaller food portions) & *Young v. Scully*, 1993 WL 88144, at \*4-5 (S.D.N.Y. Mar.

22, 1993) (stating that deprivation for a period of several days of exercise, shower, hot water, cell

cleaning equipment, wardrobe, toiletries and hygiene items did not rise to level of extreme

deprivation) (cited in *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003)).  Even if these

conditions were sufficiently serious, neither Duncan, Goord, nor Selsky were deliberately indifferent

since they did not know of and disregard an excessive risk to Plaintiff's health or safety.  When

Potter received Plaintiff's letter, an investigation was conducted and action was taken by Lanfear

---

[15] The Court further notes that Plaintiff does not bring a claim of supervisory liability against Duncan, Goord, or Selsky.  *See* Compl. at ¶¶ 21 & 22; Pl.'s Mem. of Law in Opp'n; Sims Decl. in Opp'n.

and the pest control company.

In relation to the deprivation, restraint, and cell shield orders, "where a deliberate indifference claim involves 'competing institutional concerns,' namely prison security and discipline, courts must apply the deliberate indifference standard 'in a way that accounts for the precise circumstances of the alleged misconduct and the competing institutional concerns.'" *Rodriguez v. McGinnis*, 2004 WL 1145911, at *16 (W.D.N.Y. May 18, 2004) (quoting *Trammell v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003)).  These types of cases do not present an "exception to the rule that prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Id.* (quoting *Trammell v. Keane*, 338 F.3d at 163). Thus, in *Trammell*, when a deprivation order was issued to an inmate subsequent to the issuance of a misbehavior report, the Court stated:

> [c]onsequently, we ask not simply whether the [deprivation order] was imposed with "deliberate indifference" to [the inmate's] health and safety, for it is undisputable that the Order was intended to make [the inmate] uncomfortable in an effort to alter his behavior.  Rather, we consider whether the Order was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [the inmate's] health and safety.

*Trammell v. Keane,* 338 F.3d at 163.

In this case, prior to the issuance of any of the deprivation, restraint, and cell shield orders, it was well documented that Plaintiff had an extensive history of assaultive behavior, which included assault on staff, arson, possession of a weapon, sex offenses, threats, violent conduct, creating a disturbance, lewd conduct, unhygienic acts, damaging property, tampering with state property, harassment, and disobeying direct orders.  Van Guilder Decl. at ¶ 14; Selsky Decl., Ex. A, Inmate Disciplinary History.  On April 13, 2001, Plaintiff was issued a deprivation order denying him the

privilege of his cell light because he destroyed the light.  Van Guilder Decl. at ¶ 45, Ex. D, Deprivation Order, dated Apr. 13, 2001.  Pursuant to DOCS directive 4933, because a determination was made that there was a threat to the security and safety of staff, inmates, or state property, the order was reviewed every day until April 21st, and then renewed twice by a weekly review until May 3, 2001, at which time the deprivation was removed.  *Id.* at ¶ 46, Ex. D, Deprivation Orders, dated Apr. 14, 15, 16, 17, 18, 19, 20, 21, and 28, 2001.

During this time, on May 1, 2001, Plaintiff sent a letter to Duncan, which was forwarded to Van Guilder, complaining of the deprivation orders issued to him.  Van Guilder Decl., Ex. C, Pl.'s Lt., dated May 1, 2001, & Van Guilder Lt., dated May 7, 2001.  Finnegan conducted an investigation and informed Plaintiff that the orders were put in place to preserve the safety of the unit and were not intended as punishment.  *Id.*, Ex. C, Finnegan Lt., dated May 4, 2001.  He further noted that the cell light was repaired on May 2, 2001.  *Id.*  The letter also stated that Plaintiff was satisfied with the explanation and results.  *Id.*  Because of that, the deprivation was removed.  *Id.*

Several months went by without incident until August 24, 2001, when after returning from a Hearing, Plaintiff allegedly threatened staff and used his waist chain to smash his cell lights.  *Id.* at ¶ 47, Ex. D, Deprivation Order, dated Aug. 24, 2001.  Solely because of this event, a deprivation order was issued that day again depriving Plaintiff the privilege of a cell light and out of cell activity.  *Id.*, Ex. D, Deprivation Order, dated Aug. 24, 2001.  Again, pursuant to DOCS directive 4933, the order was reviewed and renewed until September 8, 2001, at which time the deprivation was removed.  *Id.*, Ex. D, Deprivation Orders, dated Aug. 24, 25, 26, 27, 28, 29 and 30, 2001, & Sept. 1, 2001.  Again, months passed until another deprivation order was issued on January 16, 2002, because Plaintiff again threatened staff with violence.  *Id.*, Ex. D, Deprivation Order, dated

Jan. 16, 2002.  This order only lasted one day and was removed when Plaintiff was placed on hand and chain restraints.  *Id.*, Ex. D, Deprivation Order, dated Aug. 18, 2002.

On April 13, 2001, the same day the first deprivation order was issued, a restraint order was also issued and Plaintiff was ordered to be placed under full restraints because he refused orders to walk to the shower, assaulted staff, and force had to be used to prevent harm to the staff.  *Id.* at ¶ 23, Ex. B, Restraint Order, dated Apr. 13, 2001.  Pursuant to DOCS directive 4933, the order was renewed each week from April 16, 2001 until May 21, 2001, when the order was modified to the extent that Plaintiff was only in hand and chain restraints.  *Id.* at ¶ 24, Ex. B, Restraint Orders, dated Apr. 16, 23, and 30, 2001 & May 7 and 14, 2001.  The modification was done based upon observations of Plaintiff and in an effort to encourage him to behave properly.  *Id.* at ¶ 25.  The modified order was renewed until June 4, 2001, when Finnegan recommended the order be removed, which was done by Acting Deputy Superintendent for Security S. Rowe that same day.  *Id.* at ¶¶ 26 & 27, Ex. B, Restraint Orders, dated May 21 and 28, 2001, & June 4, 2001, & Mem. from Finnegan, dated June 4, 2001.

On May 1, 2001, Plaintiff wrote a letter to Superintendent Duncan, which was forwarded to Van Guilder, regarding the restraint orders.  *Id.* at ¶ 42, Ex. C, Pl.'s Lt., dated May 1, 2001.  However, while Finnegan was conducting the investigation, he told Plaintiff that the restraints were used to preserve the safety of the unit and Plaintiff stated he was satisfied with the explanation.  *Id.*, Ex. C, Finnegan Mem., dated May 4, 2001, & Van Guilder Lt., dated May 7, 2001.  A few months later, on August 10, 2001, Plaintiff was reported to have thrown an unknown liquid at SHU security personnel.  Selsky Decl., Report, dated Aug. 10, 2001, at p. 11; Van Guilder Decl. at ¶ 28.  As a result, a new restraint order was issued authorizing full hand, chain, and leg restraints whenever

*-45-*

Plaintiff was to be out of his cell.  Van Guilder Decl. at ¶ 28, Ex. B, Restraint Order, dated Aug. 10, 2001.  This order was renewed from August 13, 2001 until September 10, 2001, when the order noted that Plaintiff continued to make additional threats to staff even after the August 10th incident.  *Id.* at ¶¶ 29 & 30, Ex. B, Restraint Orders, dated Aug. 13, 20, and 27, 2001, & Sept. 3 and 10, 2001.  The restraint continued until November 11, 2001, when another notation was made that Plaintiff continued to display aggressive and threatening behavior, the order was renewed once again until December 2, 2001.  *Id.* at ¶¶ 31-33, Ex. B, Restraint Orders, dated Sept. 17 and 24, 2001, Oct. 1, 8, 14, 21, and 28, 2001, & Nov. 4, 11, 18, and 25, 2001.  Then on December 2, 2001, the order was modified and renewed until January 6, 2002, to include only hand and chain restraints, at which time Blaise, after interviewing Plaintiff, recommended removal of the restraint order.  *Id.* at ¶¶ 34-36, Ex. B, Restraint Orders, dated Dec. 2, 9, 16, 23, and 30, 2001, & Mem. from Blaise, dated Jan. 6, 2002.  The order was removed that day by Captain Rowe.  *Id.*, Ex. B, Mem. from Blaise, dated Jan. 6, 2002.

After a relatively short time period, on January 16, 2002, Plaintiff was again placed on a restraint order of hand and chain restraints for threatening staff.  *Id.* at ¶ 37, Ex. B, Restraint Order, dated Jan. 16, 2002.  Upon renewal and review of the order, on February 17, 2002, after it was noted that Plaintiff's attitude remained the same, the order remained in effect until Plaintiff's transfer from Great Meadow on March 24, 2002.  *Id.*, Ex. B, Restraint Orders, dated Jan. 20 and 27, 2001, February 3, 10, 17 and 24, 2002, & Mar. 3, 10, and 17, 2002.

Lastly, for the same reason the restraint order was issued on August 10, 2001, a cell shield order was issued as Plaintiff had thrown an unknown liquid on staff.  *Id.* at ¶ 50, Ex. E, Cell Shield Order, dated Aug. 10, 2001.  From September 10, 2001, when Captain Rowe noted that Plaintiff

continued to make threats towards the staff, until November 13, 2001, the order was renewed

weekly. *Id.* at ¶¶ 51-54, Ex. E, Cell Shield Orders, dated Aug. 13, 20 and 27, 2001, Sept. 3, 10, 17

and 24, 2001, Oct. 1, 8, 21 and 28, 2001, & Nov. 4, 2001. The cell shield order was also removed

on November 13, 2001. *Id.* at ¶ 55, Ex. E, Cell Shield Orders, dated Sept., & Birrell Mem., dated

Nov. 13, 2001. Subsequently, on January 16, 2002, Plaintiff was again issued a cell shield order

because he was banging on his cell wall and creating a disturbance. *Id.* at ¶ 56, Ex. E, Cell Shield

Order, dated Jan. 16, 2002. This continued for a month and on February 17, 2002, another order

was issued based on Plaintiff's continued behavioral problems. *Id.*, Ex. E, Cell Shield Orders, dated

Jan. 20 and 27, 2002, & Feb. 3, 10 and 17, 2002. This new order was renewed until March 24,

2002. *Id.*, Ex. E, Cell Shield Orders, dated Feb. 24, 2002, and Mar. 3, 10 and 17, 2002.

Once again, Plaintiff has failed to establish that Duncan, Goord, and Selsky were personally

involved in any alleged constitutional violation. *See Wright v. Smith*, 21 F.3d at 501. It was Van

Guilder who was responsible for issuing these orders along with his staff and not Duncan, Goord, or

Selsky. Van Guilder is not a defendant in this action. These deprivation, restraint, and cell shield

orders were not issued haphazardly, but were utilized when there were concerns with prison safety,

security, and discipline. These orders were monitored daily and/or weekly and when the

institutional concern ended, the orders were rescinded. Prison administrators are given wide-

ranging deference in this area and the Court must defer to their judgment that the orders were

needed to preserve internal order and discipline and to maintain institutional security. In the context

of trying to restore prison discipline and security, there is no evidence that the officials were

personally involved nor were deliberately indifferent to Plaintiff's health and safety.

Therefore, it is recommended that Defendants' Motion for Summary Judgment be **granted**

on the Eighth Amendment claims.[16]

### III.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants Motion for Summary Judgment (Dkt. No. 67) be

**GRANTED**; and it is further

**RECOMMENDED**, that Plaintiff's Cross-Motion for Partial Summary Judgment (Dkt. No.

70) be **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and

Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written

objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

<u>**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE**</u>

<u>**APPELLATE REVIEW.**</u>  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y*

*of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R.

CIV. P. 72, 6(a), & 6(e).

---

[16] The Court further recognizes that to the extent Plaintiff may be claiming that he did not always receive normal meals because of his restricted diet, it has been held that placement on a restricted diet does not constitute an Eighth Amendment violation.  *See* Pl.'s Mem. of Law in Opp'n at p. 12; *see also Smith v. Burge*, 2006 WL 2805242, at * 11 n. 78 (N.D.N.Y. Sept. 28, 2006) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 199-201 (2d Cir. 2004) for the proposition that the court properly dismissed the Eighth Amendment claim where the inmate alleged he was placed on a restricted diet of a loaf for seven days; *Johnson v. Gummerson*, 98-CV-0004, Mem.-Decision & Order (N.D.N.Y.), *aff'd*, 198 F.3d 233 (2d Cir. 1999) (unpublished opinion) (stating there was no Eighth Amendment violation where inmate was placed on restricted diet for seven days); *Dumpson v. Rourke*, 1997 WL 610652, at *2 & 7-8 (N.D.N.Y. Sept. 26, 1997) (finding no Eighth Amendment violation where the inmate was placed on restricted diet for seven days); & *Porter v. Coombe*, 1999 WL 587896, at *1, 3 & n.2 (holding there was no Eighth Amendment violation when the inmate was placed on restricted diet for twenty-two days, eighteen days, and fourteen days within two month's time even though the plaintiff was allergic to two of the ingredients in the restricted diet loaf)) (further citations omitted).

Date:   March 5, 2007
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge